IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GAETANA PONTICIELLO, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 05 C 1137 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| ARAMARK UNIFORM AND CAREER | ) | |
| APPAREL SERVICES, INC. and RONALD | ) | |
| BISHOP, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff Gaetana Ponticiello ("Ponticiello" or "Plaintiff") was an employee of Aramark

Uniform & Career Apparel Services, Inc., ("Aramark") from 2000 to 2004. For some of this time,

she worked with Ronald Bishop ("Bishop"), a general manager at Aramark. While they worked

together, Bishop made comments and sent e-mails to Plaintiff that she found offensive. On July 1,

2004, Aramark terminated Plaintiff, allegedly as part of a cost-cutting plan.

Plaintiff complains that Bishop sexually harassed her and that Aramark is liable for his

conduct because it was negligent in discovering or remedying Bishop's harassment and failed to

promote anti-harassment policies to ensure compliance with Title VII. She also complains that

Aramark discriminated against her on the basis of her sex when it moved her around between

different offices, did not give her a performance review, did not give her a definite job description

and terminated her while retaining a similarly situated male. Finally, she complains that Aramark

retaliated against her complaints of sex discrimination by terminating her and refusing to allow her

to apply for other positions within the company. Plaintiff asserts her claims against Aramark under

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, alleging discrimination based on sex, a hostile work environment and retaliation. Additionally, Plaintiff brings a claim against Aramark for intentional infliction of emotional distress ("IIED"), stemming from Bishop's conduct toward Plaintiff.

Defendants have moved for summary judgment on all counts.[1] Construing all facts in a light most favorable to Plaintiff and viewing all reasonable inferences in her favor, Plaintiff has failed to show a genuine issue as to any material fact and Aramark has established that it is entitled to judgment as a matter of law. Specifically, the Court finds as follows: first, because Plaintiff cannot show that she suffered an adverse employment action or was treated less favorably than similarly situated males, Aramark is entitled to summary judgment on Plaintiff's sex discrimination count; second, because Plaintiff cannot show a basis for employer liability for Bishop's allegedly harassing conduct, Aramark is entitled to summary judgment on Plaintiff's hostile work environment count; third, because Plaintiff cannot show that she suffered an adverse employment action that causally was connected to a complaint of sex discrimination, Aramark is entitled to summary judgment on Plaintiff's retaliation claim; and finally, because Bishop's conduct was not extreme and outrageous and the emotional distress Plaintiff suffered was not severe, Aramark is entitled to summary judgment on Plaintiff's IIED claim.

## STATEMENT OF FACTS

Aramark is a national company that provides uniform services and apparel. (Defs.' 56.1 ¶ 5.) Bishop works at Aramark as a general manager. (Bishop Dep., p. 22; Defs.' 56.1 ¶ 7.)

---

[1] Plaintiff originally brought the IIED claim against Bishop as well. Plaintiff having now abandoned that claim against Bishop, no claims remain against him.

Ponticiello was employed with Aramark from November 1, 2000 to July 1, 2004. (Ponticiello Dep., p. 8; Defs.' 56.1 ¶ 6.)

**Plaintiff's Employment**

When Aramark hired Ponticiello, the company maintained several facilities in the greater Chicago area, each designated with a number. (Defs.' 56.1 ¶ 16.) Ponticiello began her employment with Aramark in the 604 office. (Ponticiello Dep., p. 16; Defs.' 56.1 ¶ 19.) At that time, the 604 staff included general manager Rick Gaffney, sales manager Tony McHale, and Bishop as assistant general manager. (Defs.' 56.1 ¶¶ 28, 29.) Bishop later became general manager after Gaffney left the center. (*Id.*) In April-May 2002, Bishop transferred from 604 to 603. (Bishop Dep., pp. 22-26; Defs.' 56.1 ¶ 30.)

Ponticiello started her employment with Aramark as a new accounts installation coordinator. (Ponticiello Dep., p. 17.) In this position, she supported salespeople with their orders, including writing down the order and seeing it through its delivery. (*Id.* at p. 20.) Ponticiello soon became dissatisfied with some elements of her job. Namely, Ponticiello said she was being moved around, did not have a proper job description and did not have a performance review. (Defs.' 56.1 ¶ 107.) Prior to May 2003, Ponticiello complained to several people in Aramark's Human Resources department about her situation. (Ponticiello Dep., pp. 37-48; Defs.' 56.1 ¶ 22.) Ponticiello did not believe at the time that her discussion with human resources was a complaint of sex discrimination, though she now regards it as such. (Plf.'s Response ¶ 106.) Ponticiello also contends that her complaint to Aramark Group Controller Barbara Copeland about her employment situation was an internal complaint of sex discrimination. (Ponticiello Dep., p. 206.)

Tom McComb of Aramark's Human Resources Department met with Ponticiello to discuss her concerns. (Ponticiello Dep., pp. 38-39.) After several meetings between Ponticiello, her managers and human resources' personnel, Ponticiello became a management trainee. (*Id.* at pp. 40-43; Defs.' 56.1 ¶¶ 110, 112, 118, 122.) As a management trainee, Ponticiello performed many of the tasks of her former accounts installation coordinator position, as well as inputting the order entry, balancing and receiving checks, and processing orders. (Ponticiello Dep., pp. 21-22.) While Ponticiello felt the position was an advancement at the time, she no longer considers it one. (*Id.* at p. 54; Plf.'s Response ¶ 119.)

Upon becoming a management trainee, Ponticiello's home office moved from 604 in Chicago to 602 in Arlington Heights. (Ponticiello Dep., p. 55; Defs.' 56.1 ¶ 37.) In late 2003, Ponticiello moved to 701, and later the combined 604/701 facility in Chicago when it opened in 2004. (*Id.* at ¶¶ 39, 43.) She remained at the combined 604/701 facility until her termination in July 2004. (*Id.* at ¶ 46.)

**Bishop's Interaction with Plaintiff**

Bishop and Ponticiello worked together in the 604 center until he moved to 603 in 2002. (Defs.' 56.1 ¶¶ 29, 30.) Prior to the start of the alleged harassment, the two interacted socially on a few occasions, such as when Ponticiello would give Bishop food she had baked, or when the two occasionally would get lunch with other Aramark employees. (Defs.' 56.1 ¶ 169; Ponticiello Dep., p. 270.)

Ponticiello began receiving comments and e-mails from Bishop which she found offensive and harassing in September 2002. (Ponticiello Dep., p. 97; Defs.' 56.1 ¶ 51.) Bishop first made comments to Ponticiello about her dating another Aramark employee, Jason Odom, saying that they

should be more open about their dating.  (Ponticiello Dep., p. 99; Plf.'s Response ¶ 55.)  In 2002, Bishop also sent e-mails to Odom commenting on the relationship.  (Ponticiello Dep., pp. 100-102; Ponticiello Ex. 14.)

In March 2003, Odom told Ponticiello that Bishop had said that she needed a lip wax. (Ponticiello Dep., pp. 103-105; Ponticiello Ex. 15.)  In response, Ponticiello e-mailed a message to Bishop that asked "if u had ANY recommendations on where i can have some lip waxing services performed! U JERK!"  (*Id.*)  Bishop replied that he was not the one that commented on her needing a lip wax, yet added that Ponticiello needed a new boyfriend.  (Ponticiello Ex. 15.)  Bishop later in the same exchange told Plaintiff what "SKUNK BOY" – referring to Odom – will look like when Bishop "get[s] done with him."  (*Id.*)  Bishop then attached a picture title "BadBear.jpg" which depicted the partially clothed remains of a person who appears to have been mauled to death by a bear.  (*Id.*)  Bishop also attached a photo, entitled "Iloveyou.jpg," depicting human excrement, and a video showing a topless woman doing jumping jacks.  (*Id.*)

Less than a week after this exchange, on March 28, 2003, Ponticiello sent an e-mail to Bishop showing a picture she described as "nasty."  (*Id.* at Ex. 17.)  The photo showed a man with part of his intestines hanging outside his body.  (Defs.' 56.1 ¶ 68.)  Bishop replied that he was "going to PUKE!" (Ponticiello Ex. 17.)  Later that day, Bishop sent Ponticiello a picture depicting a person hiding behind the dashboard of a car.  (*Id.* at Ex. 19.)  Bishop wrote "[t]his is how they got Jason Odom's family in the country."  (*Id.*)  Ponticiello found the e-mail harassing, though Odom considered it a joke and was not offended.  (Plf.'s Response ¶ 69; Odom Dep., pp. 60-61.)  Bishop also sent Ponticiello several picture attachments and commented that Odom was the "third one to the end," referring to a picture of a man performing a sexual act.  (Ponticiello Ex. 20.)

On June 20, 2003, Ponticiello sent an e-mail to several Aramark employees, including Bishop, that contained her weekly work schedule. (Ponticiello Ex. 21.) Bishop responded to Ponticiello that she had not "done SHIT for the last year." (*Id.*) Ponticiello replied that she was impressed that Bishop "graduated from the College of Ebonics." (Ponticiello Dep., pp. 138-139; Ponticiello Ex. 20.) Twice in the exchange Ponticiello used the phrase "LOL," which means she was "laughing at the situation." (*Id.*; Ponticiello Dep., p. 145.) Bishop later sent her a video clip, called "Headjob.mpeg," which depicted a man sticking his shaved head inside a woman's vagina. (Ponticiello Dep., p. 151.)

On June 24, 2003, Ponticiello forwarded her schedule to Bishop, to which he responded "HAHAHAHAHA . . . that's funny." (Ponticiello Ex. 22.) She replied "u know what: don't EVEN try it!" (*Id.*; Ponticiello Dep., p. 147.) The next week, on June 30, Ponticiello again sent her weekly schedule and Bishop responded "[t]his cracks me up every week." (*Id.* at Ex. 25.) She replied sarcastically "WELL, I'm SOOO very happy that I can be your weekly amusement!" (*Id.*; Ponticiello Dep., p. 154.) Bishop replied with a picture called companypicnic.jpg which depicted a nearly naked woman lying face down on a picnic table asleep surrounded by beer bottles. (Ponticiello Ex. 25.) Bishop's message insinuated that Plaintiff was the woman in the picture. (*Id.*)

On July 15, 2003, Bishop sent a picture to Ponticiello to which she replied that Bishop had to stop sending those pictures because they "are absolutely disgusting." (Ponticiello Ex. 27.) She added that Bishop was "one twisted man. YUK! Thanks." (*Id.*) Bishop responded "looks who (is) talking, I got all this from you." (*Id.*) Later in the exchange, Ponticiello included the character ":)" which she said represented a "smiley face" and her intent to make light of the situation. (*Id.*; Defs.' 56.1 ¶ 85.)

Following the July 15, 2003 exchange, Ponticiello did not receive any more allegedly harassing e-mails from Bishop until June 10, 2004. (Defs.' 56.1 ¶ 88.) On June 10, she received from Bishop a video clip called "When the Wife Has A Hedache" attached to an e-mail in which Bishop wrote the text: "I have also attached a little movie that I fell represents what it is like at the Odom house!!!!" (Ponticiello Ex. 31.) The video depicts a fake commercial wherein a man has intercourse with an artificial vagina attached to a bottle of aspirin. (Plf.'s Response ¶ 90.) Following the June 10 correspondence between Ponticiello and Bishop, she received no more e-mails that she felt were harassing or offensive. (Defs.' 56.1 ¶ 92.)

**Aramark's Anti-Harassment Policy**

Aramark fostered a number of ways that employees could complain if they felt sexually harassed. Aramark provided a copy of its sexual harassment policy to every employee, including all new hires. (Grabowski Aff., ¶¶ 18, 26.) It made extra copies available to employees at each of the Chicago-area locations. (*Id.*) It maintained a hotline that employees could call confidentially at any time if those employees did not feel comfortable telling human resources or their supervisor about the problem. (Grabowski Dep., p. 40.) It posted the sexual harassment policy, posters advertising the hotline, and posters containing the key elements of Aramark's Business Conduct Policy on bulletin boards at Chicago-area Aramark facilities. (Grabowski Aff., ¶¶ 9, 12-16, 19-24.) Ponticiello never reported Bishop's harassment to anyone at Aramark. (Ponticiello Dep., p. 183.)

**Plaintiff's Termination**

Aramark terminated Ponticiello on July 1, 2004. (Defs.' 56.1 ¶ 6.) The company was under a cost-cutting initiative, and managers were instructed to find ways to save money. (Copeland Dep., pp. 42-43.) After Copeland discussed the situation with other Aramark managers, they decided to

eliminate Ponticiello's management trainee position. (*Id.* at p. 45.) Copeland and Collins, the controller of the 604 location, were present for the meeting, where Copeland broke the news to Ponticiello. (*Id.* at p. 46.) After hearing she was terminated, Ponticiello asked Copeland if she were serious. (*Id.*; Ponticiello Dep., p. 234.) Once Copeland confirmed it, Ponticiello walked out of the office without saying another word. (*Id.*)

Ponticiello filed a complaint of discrimination with the City of Chicago's Commission on Human Relations on July 19, 2004, alleging discrimination based on her sex. (Ponticiello's Dep., Ex. 42.) She then made a charge of discrimination with the Illinois Department of Human Rights on July 26, 2004. (*Id.* at Ex. 43.) Upon learning of Ponticiello's complaint, Aramark conducted an internal investigation into Bishop's conduct. (Bishop Affidavit, Ex. 6.) The investigators determined Bishop had violated company policy by sending the sexually explicit e-mails to Ponticiello. (*Id.*) Following the investigation, on Sept. 28, 2004, Aramark president Stephen Donly sent Bishop a letter reprimanding him for his conduct. (*Id.*) The letter scolded Bishop for his actions and warned him that if he ever conducted himself similarly, he would be fired. (*Id.*) Donly punished Bishop by withholding his annual $10,000 bonus. (*Id.*) He did not terminate Bishop because the internal investigators found that the e-mails were not unwelcome, and that Ponticiello did not use any internal mechanisms to complain of his behavior. (*Id.*)

## DISCUSSION

Summary judgment is correct when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must construe all facts in a light most favorable to the non-moving party and

view all reasonable inferences in the non-moving party's favor to determine if a genuine issue of a material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A material fact is one that is outcome-determinative under governing law. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). In analyzing the facts for the purposes of a summary judgment, the Court will "limit its analysis of the facts . . . to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. *See Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). An adequate rebuttal requires a citation to specific support in the record, an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

## I.    Sex Discrimination

Title VII prohibits an employer from discriminating against an employee based on his or her sex. *See* 42 U.S.C. 2000e-2(a)(1). Plaintiff alleges Aramark subjected her to adverse employment actions based on her sex and treated her less favorably than similarly situated males. Plaintiff can prove discrimination using either the direct or indirect method. *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). The direct method relies on direct or circumstantial evidence that points directly to a discriminatory reason for the employer's actions toward the plaintiff, such as an admission by the decisionmaker. *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir.

2003). Since Plaintiff has not produced any evidence directly demonstrating Aramark's discriminatory motives, she must prove her claim indirectly. *See Rhodes*, 359 F.3d at 504. Under the indirect method, a plaintiff first has the burden of proving a prima facie case based on sex discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1988). To establish a prima facie case, a plaintiff must show: (1) she was a member of a protected class; (2) she was performing her job satisfactorily; (3) she experienced an adverse employment action; and (4) similarly situated male employees were treated more favorably. *See Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002). If the plaintiff establishes her prima facie case, the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for terminating the employee. *See Rhodes*, 359 F.3d at 504. If the defendant does so, the plaintiff then can show the defendant's proffered reason was mere pretext for discrimination. *Id.*; *see also Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002).

Defendants concede that Plaintiff was a member of a protected class and performed her work satisfactorily. Consequently, Plaintiff must prove the last two prongs of her prima facie case – that she experienced an adverse employment action and that similarly situated males received more favorable treatment at Aramark. Construing Plaintiff's claims and arguments broadly in her favor, Plaintiff alleges that she was discriminated against based on her sex because: (1) she was moved around between different offices, (2) she did not receive a performance review, (3) she did not have a proper job description, and (4) she was terminated.

### Adverse Employment Action

An adverse employment action is a "significant change in the claimant's employment status," including termination, denying a promotion, or reassignment to a position with significantly different

job duties or benefits. *Rhodes*, 359 F.3d at 504. None of Plaintiff's first three complaints constitutes an adverse employment action. *See Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) ("[W]hile adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action"); *Rhodes*, 359 F.3d at 504 ("A materially adverse employment action is something more disruptive than a mere inconvenience or an alteration of job responsibilities"). Even if Plaintiff's first three complaints were adverse actions, they are time-barred because Plaintiff did not file an EEOC charge within 300 days of these allegedly discriminatory acts. *See Speer v. Rand McNally & Co.*, 123 F.3d 658, 662 (7th Cir. 1997). The alleged discriminatory acts occurred prior to May 2003, but Plaintiff did not file her EEOC claim until July 26, 2004. *See Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 677 (7th Cir. 2005) ("[C]onduct occurring prior to the limitations period cannot form the basis of a Title VII suit").

Neither are these first three complaints actionable as part of a "continuing violation." Under the continuing violation doctrine, a plaintiff can get relief for acts that are time-barred by linking them to acts that occurred within that period. *See Shanoff v. Ill. Dept. of Human Serv.*, 258 F.3d 696, 701 (7th Cir. 2001). The continuing violation doctrine, however, is inapplicable when the time-barred incident should have indicated to the plaintiff that her rights were violated. *See EEOC v. N. Gibson Sch. Corp.*, 266 F.3d 607, 617 (7th Cir. 2001). Plaintiff admitted that she was aware of the alleged discriminatory acts when she lodged her 2003 complaint with Aramark's human resources department. (Ponticiello Dep., pp. 54, 206.). Since Plaintiff was on notice of the conduct well in advance of the limitations period, they cannot form part of a "continuing violation." *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) (plaintiff who complained to supervisors was

time-barred from suit filed years later complaining of same acts).   Accordingly, Aramark's

termination of Plaintiff was the only adverse employment action that Plaintiff experienced.

### *Similarly Situated Males Treated More Favorably*

Plaintiff's sex discrimination claim based on her termination fails because she cannot show

that she was treated less favorably than similarly situated males.  *See Markel*, 276 F.3d at 911.  "To

show that another employee is similarly situated, a plaintiff must show that there is someone who

is comparable to her in all material respects," including performance, qualifications, or conduct.

*Durkin v. City of Chi.*, 341 F.3d 606, 613 (7th Cir. 2003).

As evidence of more favorable treatment for a similarly situated male, Plaintiff points to

Jason Wilgosz.  Wilgosz received Plaintiff's accounts installation coordinator position when she

took the management trainee position.  Plaintiff and Wilgosz were not similarly situated at the time

of her termination because they held different job titles and responsibilities.  *See Bio v. Fed. Express

Corp.,* 424 F.3d 593, 597 (7th Cir. 2005) (individuals having different job descriptions not similarly

situated); *Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 651 (7th Cir.

2001) (individuals holding different positions not similarly situated).  Wilgosz occupied her former

position (new accounts installation coordinator) which Plaintiff gave up to move to a new position

(management trainee).  (Plf.'s Response ¶ 23.)  In reduction-in-force cases, particularly, a plaintiff

usually must show that the similarly situated employee obtained the desired job at or around the

same time as the reduction in force.  *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7thCir.

2000); *Biolchini v. Gen. Elec. Co.*, 167 F.3d 1151, 1154 (7th Cir. 1999).  Because Wilgosz took over

Plaintiff's job in 2003, more than one year before her termination during the cost-cutting initiative,

his selection for the position is not evidence that Aramark treated a male more favorably than

Plaintiff. Likewise, Plaintiff and Wilgosz were not similarly situated since they held different job positions with different responsibilities.

Because Plaintiff cannot meet the third and fourth elements of her prima facie case, Aramark is entitled to summary judgment on her sex discrimination claim.

## II.    Retaliation

Title VII forbids an employer from retaliating against an employee who exercises her Title VII rights. *See* 42 U.S.C. § 2000e-(3)(a)(1). An employer has retaliated when it takes an adverse employment action against an employee who opposes the impermissible discrimination. *See Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003). To establish a prima facie case of retaliation, a plaintiff must show: (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action. *See Smart,* 89 F.3d at 440. If a plaintiff proves her prima facie case, a defendant must produce a legitimate, nondiscriminatory explanation for the adverse action. *See Reed v. Shepard*, 939 F.2d 484, 493 (7th Cir. 1991). A plaintiff still can prevail by showing that the defendant's proffered reason for the termination is pretextual. *See Reed*, 939 F.2d at 493. Construing Plaintiff's claim liberally, Aramark retaliated against her for: (1) her complaint of Bishop's conduct on July 19, 2004 and July 26, 2004, and (2) her complaint of sex discrimination to human resources in May 2003.

Ponticiello filed a complaint of discrimination with the City of Chicago's Commission on Human Relations on July 19, 2004, alleging discrimination based on her sex. (Ponticiello's Dep., Ex. 42.) She then made a charge of discrimination with the Illinois Department of Human Rights on July 26, 2004. (*Id.* at Ex. 43.) Aramark terminated Plaintiff on July 1, 2004. (Defs.' ¶ 6.) Temporarily, Plaintiff's exercise of a protected activity cannot come after the adverse employment

action because logically "an employer cannot retaliate if there is nothing for it to retaliate against." *Durkin*, 341 F.3d at 614. Thus, Plaintiff cannot show that Aramark retaliated against her for reporting Bishop's actions given that she never complained about Bishop prior to her state and municipal filings, filings which occurred after the adverse employment action – her termination. (Plf.'s Response ¶ 125.) Additionally, Plaintiff cannot base a claim on Aramark's alleged failure to allow her to transfer or apply for other positions within the company after her termination since Plaintiff never applied for other positions. *See Sauzek v. Exxon Coal, USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) (employers have no duty to transfer employees when reducing workforce for economic reasons, and plaintiff can only show discrimination for failure to transfer when she applies for available jobs with company).

Plaintiff also claims that Aramark retaliated for her complaint of sex discrimination to the human resources department in May 2003. Again, these claims do not constitute adverse employment actions. Further, there is no causal connection between her complaint and her termination, and she thus fails the third element of her prima facie case. *See Reed*, 939 F.2d at 492. Aramark terminated Plaintiff on July 1, 2004, more than one year after her May 2003 complaints. (Defs.' 56.1 ¶ 154.) This nearly 14-month interim period between her change in job titles and her termination indicates that the two events are not causally linked. *See Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009 (7th Cir. 2000) (one-year gap between protected activity and termination shows lack of retaliation); *see also Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1008 (7th Cir. 2002).

***Pretext***

Aramark produced a legitimate, nondiscriminatory reason for terminating Plaintiff. *See Reed*, 939 F.2d at 493. In 2004, the company was under a cost-cutting initiative and needed to reduce expenses, and it terminated Plaintiff for cost-containment reasons. (Copeland Dep., p. 41.); *see Billow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) ("A desire to cut costs is a legitimate, nondiscriminatory justification for an adverse employment action"). Plaintiff's only evidence that this explanation is a pretext for discrimination was Aramark's failure to terminate Jason Wilgosz. Because Plaintiff and Wilgosz held different job positions at different centers with different supervisors, the fact that Aramark did not fire Wilgosz is not sufficient to create a genuine issue as to whether Aramark's cost-cutting explanation was a pretext to discriminate against Plaintiff.

Plaintiff cannot meet the elements of a prima facie case for retaliation as to either her official complaints of Bishop's conduct in July 2004 or her earlier complaints made prior to May 2003. Even if Plaintiff established a prima facie case, Plaintiff does not rebut adequately Aramark's legitimate, nondiscriminatory reason for her termination. As such, Aramark is entitled to summary judgment on Plaintiff's retaliation count.

## III. Hostile Work Environment

Plaintiff alleges that Aramark violated Title VII by allowing Bishop to harass Plaintiff, thereby creating a hostile working environment. *See* 42 U.S.C. § 2000e-2(a)(1). To prevail on her hostile work environment claim, Plaintiff must show that: (1) she was subjected to unwelcome sexual harassment, (2) the harassment was based on sex, (3) the harassment was severe and pervasive enough to alter the conditions of her employment and create a hostile, intimidating or

15

offensive work environment, and (4) there exists a basis for employer liability. *See Rhodes*, 359 F.3d at 505. Plaintiff cannot demonstrate that Aramark is liable for Bishop's actions.

An employer's liability for a harasser's conduct hinges on whether the harasser is the victim's supervisor or the victim's co-employee. *Hall*, 276 F.3d at 355. An employer is liable for the harassing behavior of a co-employee only if the employer was negligent in discovering or remedying the harassment. *Id.* at 356; *see also Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001). If the harasser is the victim's supervisor, the employer is strictly liable for that harassment if: (1) the harasser is high enough within an organization to be considered the organization's proxy – such as a president, owner, partner or corporate officer – or (2) the harasser is a lower-level supervisor who took a tangible employment action as part of his harassment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). If an employer is not strictly liable for one of these two reasons, an employer may avoid liability for a supervisor's harassment by showing that "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765. Hence, the first question is whether Bishop was Plaintiff's supervisor.

A supervisor is someone who has immediate or successively higher authority over the employee. *See Ellerth*, 524 U.S. at 765. A supervisor must have the "authority to affect the terms and conditions of the victim's employment," including the ability to "hire, fire, demote, promote, transfer, or discipline an employee." *Hall*, 276 F.3d at 355; *see also Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998). "An employee merely having authority to oversee

aspects of another employee's job performance does not qualify as a supervisor in the Title VII context." *Rhodes*, 359 F.3d at 506; *see Hall*, 276 F.3d at 355 (employee with authority to direct plaintiff's work operations, provide input into performance reviews and train plaintiff was not a Title VII supervisor). A final angle, the alleged supervisor must supervise the plaintiff in question – not just any employee or employees within the company – and possess the ability to directly affect the plaintiff's employment. *Id.*

Although Bishop was an Aramark supervisor, he was not Plaintiff's direct supervisor at the 604 location from April 2002 until her termination – the time frame during which the allegedly harassing behavior took place. (Defs.' 56.1 ¶ 31.) Bishop supervised the 603 location, not the 604 facility where Plaintiff was located. (Defs.' 56.1 ¶ 30.) Plaintiff maintains that she had to move around to various Aramark sites through the greater Chicago area to perform tasks on temporary bases. (Ponticiello Dep., p. 22; Plf.'s Response ¶ 27.) When she would be at those locations, that location's manager became her supervisor. (Ponticiello Dep., p. 64.) In addition, she would routinely e-mail her weekly schedule to various managers at these sites. (*Id.* at p. 25.) As such, each location's manager was her supervisor, including Bishop, because each could dictate how she performed her work and could critique her performance. (*Id.* at p. 233; Plf.'s Response ¶¶ 31-34, 36, 38, 40, 43-46.) Even if, as Plaintiff contends, Aramark recognized Bishop as Plaintiff's supervisor, Title VII does not.[2] Bishop's authority to critique and oversee Plaintiff's work is not the

_____

[2] Assuming that Bishop was Plaintiff's supervisor, Aramark would not be strictly liable for his conduct because Bishop is not high enough in the Aramark hierarchy to be considered the company's proxy and took no tangible employment action against Plaintiff. (Defs.' 56.1 ¶¶ 28- 29, 40); *see Johnson v. West*, 218 F.3d 725, 730 (7th Cir. 2000) (harasser who had more than two supervisors above him and was not the only person to whom plaintiff reported was a "low-level supervisor"). Moreover, Aramark exercised reasonable care to prevent and correct promptly any

authority that Title VII requires in a supervisor. *See Rhodes*, 359 F.3d at 506. Bishop did not have the authority to fire, demote or discipline Plaintiff, nor was he involved with her reassignments, job title changes or termination. (Defs.' 56.1 ¶¶ 45, 47).

### *Employer liability for co-employee*

Bishop being a co-employee of Plaintiff, Aramark is liable for his conduct if the company was negligent in discovering or remedying Bishop's harassment. *Berry*, 260 F.3d at 803 (an employer must take "reasonable steps to discover and rectify" sexual harassment of its employees to avoid liability). An employer "must have notice or knowledge of the harassment before it can be held liable." *Durkin*, 341 F.3d at 612. Without knowledge, "the law does not require employer to do more than promote general anti-harassment policies and training to ensure compliance with Title VII." *Rhodes*, 359 F.3d at 507.

Aramark "is not liable for co-employee sexual harassment when the victim, having a mechanism by which to report harassment, fails to do so." *Hall*, 276 F.3d at 357; *see also Rhodes*, 359 F.3d at 507 (hostile environment claim failed when plaintiff failed to take advantage of preventive or corrective measures that defendant provided). A plaintiff can notify the employer of the harassment by using formal channels for complaints or by telling anyone that the victim "reasonably believed could receive and respond to complaints of harassment." *Id.* Plaintiff took no steps to notify Aramark of Bishop's harassing e-mails and behavior. (Defs.' 56.1 ¶ 125.) Plaintiff gave two reasons why she did not report Bishop's conduct: (1) that she did not know she could report

---

sexually harassing behavior, and Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by Aramark. (Ponticiello Dep., Ex. 42); (Ponticiello Dep., p. 183); (Grabowski Aff., ¶¶ 12-18, 20-23); (Jardon Aff., ¶¶ 3-8); (Defs.' 56.1 ¶¶ 140, 144-46); (Plf.'s Response, ¶ 146.)

Bishop's harassing behavior, and (2) that she was afraid to report his behavior. (Ponticiello Dep., pp. 185-187.)

Aramark implemented formal mechanisms to discover harassment occurring in the workplace – and thus could reasonably expect Plaintiff to utilize them. *Hall*, 276 F.3d at 356. Aramark posted notices of its sexual harassment policies on bulletin boards and distributed a copy of its sexual harassment policy. (Grabowski Aff., ¶¶ 12-18); (Jardon Aff., ¶¶ 3-8). It printed a copy of its sexual harassment policy – which required all employees to report harassment immediately – on all applications for employment. (Defs.' 56.1 ¶ 140.) It also created a 24-hour hotline for employees to call if they felt harassed, and posted the hotline on its bulletin boards. (Defs.' 56.1 ¶¶ 144-45.) The posters containing such information had been hanging in all the market centers in the Chicago area for at least two years when Plaintiff was terminated. (Grabowski Aff., ¶¶ 20-23); (Jardon Aff., ¶¶ 3-8). Plaintiff acknowledges that the various market centers had bulletin boards, but said she never looked at them and no one at Aramark pointed out the posters or notices on the bulletin boards to her. (Defs.' 56.1 ¶ 146; Plf.'s Response, ¶ 146.) Besides Aramark's actions to promote its anti-harassment policies, Plaintiff admitted a some knowledge of how to report alleged harassment. Plaintiff previously had contacted Aramark's human resources department with complaints of sexual discrimination. (Ponticiello Dep., pp. 214-215.) She also had commonsense knowledge of how to report sexual harassment. (*Id.* at p. 185.) Given her knowledge and Aramark's preventive efforts, Plaintiff's statement that she did not know how to report sexual harassment is insufficient to create a genuine issue of material fact regarding Aramark's liability. *See Rhodes*, 359 F.3d at 507 (anti-harassment policies sufficient when names and phone numbers of contact people to handle complaints posted in workplace); *Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639, 644 (7th Cir. 2000) (anti-

harassment policies were placed in public accessible location in branch offices where all employees could look at them, plus plaintiff knew that she could complain to human resources if there were a harassment problem). Likewise, Plaintiff provides no evidence to support her alleged fear of reprimand or retaliation if she reported Bishop's behavior, neither Bishop nor any other Aramark employee threatened her in any manner. (Defs.' 56.1 ¶¶ 97-98, 100, 125.)

Aramark promptly corrected the harassment once it became aware of it. Aramark undertook an investigation after Plaintiff complained to state and municipal agencies. (Ponticiello Dep., Ex. 42.) Two months after becoming aware of the situation, Aramark completed its investigation by threatening Bishop with termination and denying him a $10,000 bonus after concluding his conduct violated company policy. (Bishop Affidavit, Ex. 6); *see Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639, 643 (7th Cir. 2000) (company acted promptly by cutting harasser's salary by $10,000 after investigation into his conduct).

Because Bishop was not Plaintiff's supervisor, Aramark was not aware of any harassment until after Plaintiff was terminated and Aramark promptly addressed the issue as soon as it became aware of the allegations, Aramark cannot be held liable for Bishop's conduct toward Plaintiff.

## IV. Intentional Infliction of Emotional Distress

To state a claim for IIED under Illinois law, a plaintiff must show: (1) that the conduct was extreme and outrageous; (2) that the actor knew or was substantially certain that emotional distress would result from his actions; and (3) that the emotional distress the plaintiff suffered was severe. *See Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill.1976); *McGrath v. Fahey*, 533 N.E.2d 806,

809 (Ill. 1988). If Plaintiff can establish these elements, she then must establish a basis for Aramark's liability for Bishop's conduct.

The first element – whether conduct is extreme and outrageous – is an objective consideration. *See Doe v. Calumet City*, 641 N.E.2d 498 (Ill. 1994). When considering an IIED claim, the intensity and duration of the distress are factors to evaluate. *See McGrath,* 533 N.E.2d at 809. The alleged conduct must be so outrageous and extreme as to go "beyond all possible bounds of decency" and be so severe that no reasonable person could endure it. *Davis*, 360 N.E.2d at 767. The conduct must be that which is intolerable in a civilized community, *Adams v. Hertzberg*, 684 N.E.2d 935, 941 (Ill. App. Ct. 1997), or is "so abusive and atrocious that it would cause severe emotional distress to a person of ordinary sensibilities." *Rudis v. Nat'l. Coll. of Educ.*, 548 N.E.2d 474, 477 (Ill. App. Ct. 1989). Under this standard, an IIED claim does not include "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Davis*, 360 N.E.2d at 767. Specifically, "in the employment setting, the conduct complained of must be particularly outrageous." *Piech*, 841 F. Supp. at 831.

Plaintiff alleges that she endured offensive and humiliating taunts and jokes for the more than three and a half years that she worked at Aramark from 2000 to 2004. (Complaint ¶ 18; Defs.' 56.1 ¶ 6.) But this conduct, while perhaps vulgar or disgusting, is not outrageous enough to meet the standard for IIED. *See Miller v. Eq. Life Assurance Soc'y.*, 537 N.E.2d 887 (Ill. App. Ct. 1989) (plaintiff surrounded for three and a half years by inconsiderate, rude, vulgar, uncooperative, unprofessional, and unfair supervisors and co-workers did not meet claims for IIED). Moreover, many people received and forwarded the e-mails that Bishop sent to Plaintiff, demonstrating that however tasteless the content of the e-mails, they were not so shocking as to be beyond the general

public's bounds of decency. *See Piech*, 841 F. Supp. at 831 (plaintiff who was "continually exposed to a work atmosphere consisting of offensive and tasteless humor of a sexual nature, references to the female anatomy, and rumors of male partner sexual misconduct" failed to state IIED claim in part because such conduct "does not shock the conscience of a reasonable employee.").

Without more, Plaintiff cannot succeed on her IIED claim. She has not offered evidence that Bishop attempted to coerce her into engaging in illegal activity or a sexual relationship. *See Milton v. Ill. Bell Tel. Co.*, 427 N.E.2d 829, 832 (1981); *Clay v. Quartet Mfg. Co.*, 644 F. Supp. 56, 61 (N.D. Ill. 1986). Nor has she proved that he threatened her with violent bodily harm or loss of her job. *See Pavilion*, 561 N.E.2d at 1248, 1251.

Plaintiff also fails to offer evidence that would prove the third element of the IIED claim: that the emotional distress she suffered was severe. *Davis*, 360 N.E.2d at 767. To prove this element, the plaintiff must show that the distress she feels has an intensity beyond what any reasonable person could endure. *Id.* Lesser emotions will not suffice: "[f]right, horror, grief, shame, humiliation and worry [are] not sufficient to give rise to a cause of action" for IIED. *Adams*, 684 N.E.2d at 942.

Plaintiff testified that Bishop's conduct made her feel many things: appalled, annoyed, aggravated, disgusted, offended, upset, embarrassed, uncomfortable, belittled and self-conscious. (Ponticiello Dep., pp. 103, 105, 106, 111, 119, 152, 175, 224, 231.) She claims she even cried in front of Bishop while telling him to stop his actions. (*Id.*, at p. 119.) None of these emotions is strong enough to show severe emotional distress. *See Adams*, 684 N.E.2d at 942 (plaintiff denied IIED claim when crying); *Knysak v. Shelter Life Ins. Co.*, 652 N.E.2d 832, 839 (Ill. App. Ct. 1995) (claim denied when upset); *Mader v. Motorola*, 1998 WL 164880 (N.D .Ill. 1998) (claim denied

when embarrassed); *Woods v. Clay*, 2005 WL 43239 (N.D. Ill. 2005) (claim denied when depressed and humiliated); *Farrar v. Bracamondes*, 332 F. Supp.2d 1126 (N.D. Ill. 2004) (claim denied when stressed and anxious). And Plaintiff did not seek out any mental health treatment, medication or medical help nor does she feel that she needs to do so. (Ponticiello Dep., p. 231.) In general, severe emotional distress requires some medical treatment. *See, e.g., Adams*, 684 N.E.2d at 942 (plaintiff did not state IIED claim when he was not hospitalized, nor sought medication or psychiatric treatment); *Knysak*, 652 N.E.2d at 840 (plaintiff who provided no evidence of psychiatric treatment denied IIED claim); *Mader*, 1998 WL 164880 at \*12 (plaintiffs who took no medication failed to present IIED claim); *Woods*, 2005 WL 43239 at \*17 (shame, depression, and humiliation, without evidence of hospitalization, treatment or medication, does not constitute severe emotional distress); *Farrar*, 332 F. Supp.2d at 1126 (stress, nervousness, and anxiety not requiring medical treatment do not show severe emotional distress).

Therefore, while a jury could find that Bishop did intend, or should have known, the messages he sent to Plaintiff would cause her harm, the actual harm she suffered was not severe. Moreover, his conduct itself was not objectively extreme and outrageous. As such, it is unnecessary to consider whether liability under an IIED claim for Bishop's actions can be imputed onto Aramark. And Aramark is entitled to summary judgment on Plaintiff's IIED claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted and judgment is entered in favor of Defendants.

_____So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: September 19, 2006